UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AUREL SMITH,

                                    Plaintiff,

            v.                                                      9:07-CV-1150
                                                                    (NAM/ATB)

DALE ARTUS, et al.,

                                    Defendants.
_____

APPEARANCES:                          OF COUNSEL:


AUREL SMITH
02-A-6279
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953
Plaintiff, *Pro Se*

HON. ANDREW M. CUOMO                   CHRISTINA L. ROBERTS-RYBA, AAG
New York State Attorney General        JUSTIN C. LEVIN, AAG
The Capitol
Albany, New York 12224
Attorney for Defendants

**Hon. Norman A. Mordue, Chief U.S. District Judge**


### MEMORANDUM-DECISION and ORDER

        In this *pro se* civil rights action, plaintiff Aurel Smith claims that defendants violated his

First Amendment right to freely practice his chosen religion and the First Amendment

Establishment Clause, as well as his rights under the Religious Land Use and Institutionalized

Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*. and the Religious Freedom Restoration Act

of 1993 ("RFRA").  Dkt. Nos. 6, 38.  Plaintiff also claims that defendants have violated his right to

Equal Protection in connection with the right to practice his chosen religion.  *Id.*  Finally, plaintiff

alleges that defendants' conduct violated state law, regulations and Department of Correctional

Services ("DOCS") Directives.  *Id.*

# I.  FACTUAL BACKGROUND

The facts in this case, unless otherwise noted, are undisputed.[1]

## A.    Plaintiff's Religious Beliefs

Plaintiff is in faith a Muslim, an adherent of the Religion of Islaam, and belongs to the Sunni branch of Islaam.  Dkt. No. 93 at 2, ¶ 6.  His religion requires that he pray five times a day, at definitive time-frames occurring at particular phases of the day.  *Id*. ¶ 6.  The prayer is a formal prayer known as As-Salaah, also known as Salaah, Salaat, Salah, and Salat.[2]  Salaah requires specific recitations as well as physical acts.  *Id*. ¶ 7.  As a Muslim, plaintiff is required to pray the Salaah, preferably in congregation, with two Salaah being the minimum number of the five that must be prayed in congregation.  *Id*. ¶ 9.  While group prayer is preferable to individual prayer, even if he is alone, plaintiff is required to pray the Salaah individually wherever he is at the times prescribed for the prayer.  *Id*.  Plaintiff is also required to attend Jumu'ah (sermon and prayer) every Friday after noon time, at approximately 12:30 p.m., which must be in a congregate setting.  *Id*. ¶ 10.  While Jumu'ah takes the place of the midday Salaah, the midday Salaah may not replace Jumu'ah.  *Id*.  It is sinful to omit Jumu'ah in preference to simply praying the midday Salaah.  *Id*.

## B.    The Events Forming the Basis of this Action

### 1.    Clinton Correctional Facility (Prayer in Recreation Yard)

Plaintiff was housed at Sing Sing Correctional Facility ("Sing Sing") from December 2002 until September 2005.  Dkt. No. 93 at 3, ¶ 11.  While there, he prayed his Salaah in the recreation

---

[1]  The facts set forth in this section are taken from: (1) the amended complaint; (2) the answer to the amended complaint; (3) the supplemental complaint; (4) the answer to the supplemental complaint; (5) defendants' statements of material facts ("defendants' Rule 7.1 Statement"); (6) the exhibits and evidence submitted by defendants in support of their motion for summary judgment; (7) plaintiff's deposition transcript; (8) the exhibits and evidence submitted by plaintiff in opposition to defendants' motion for summary judgment; and (9) plaintiff's motion for partial summary judgment.  With minor exceptions, plaintiff does not challenge the recitation of facts set forth in defendants' Rule 7.1 Statement.  *See* Dkt. No. 91 at 1-2.

[2]  For purposes of this Order, the Court will refer to the prayer at Salaah.

yard when the recreation period overlapped a prescribed prayer time.  *Id*.  Plaintiff was housed at

Clinton Correctional Facility ("Clinton") from September 2005 until September 2007.  *Id.* ¶ 12.  At

Clinton, plaintiff alleges that he was denied the right to perform his Salaah in the recreation yard

because defendants had in place, and enforced, "a facility-level policy prohibiting Muslim

prisoners" from doing so, even though the daily recreation period coincided with Muslim

mandated prayer times.  Dkt. No. 6 ("Am.Compl.") ¶ 6.  Plaintiff also alleges that he was

threatened with disciplinary sanctions under DOCS Rule #106.10 (refusing a direct order) if he

chose to disobey the facility level policy which prohibited Muslim prayer in the recreation yard.

*Id*.  The prohibition against Muslim prayer in the recreation yard applied regardless of whether a

Muslim inmate wished to pray individually or in a group.  *Id*. ¶ 7.

In March 2007, plaintiff wrote to defendants Artus and Turner, as well as to S. Racette,

Deputy Superintendent of Security, requesting that Muslim inmates at Clinton be allowed to either

individually, or in a group not to exceed six persons, perform their Salaah at the religiously

prescribed times while in the recreation yard on the sectional recreation courts to which they are

either a member or a guest of a member.  Am.Compl. ¶ 8; *see also* Dkt. No. 6-1 at 3 (Ex. A).

When plaintiff did not receive a response to his March 2007 letter, on April 16, 2007, he

resubmitted his requests to Artus, Turner, and Racette.  *Id*. ¶ 9; *see also* Dkt. No. 6-1 at 5 (Ex. B).

As of May 2007, plaintiff had not received a response to either his March or April 2007

letters.  Am.Compl. ¶ 10.  On May 2, 2007, plaintiff met with Sgt. Douglas (the facility Inmate

Grievance Resolution Committee ["IGRC"] Supervisor) and Correctional Officer Bombard, and

requested information on Clinton's policy regarding the ability (or lack thereof) of Muslim inmates

to perform Salaah in the recreation yard.  Am.Compl. ¶ 10.  Plaintiff also asked how the Clinton

policy compared to the policy at other state correctional facilities.  *Id*.  At this meeting, plaintiff

was advised that Muslim prisoners may pray their Salaah "on their sectioned recreation courts to which they are either members or guest thereof." *Id*.  After plaintiff met with Douglas and Bombard, and in light of their statements at the meeting, plaintiff and other Muslim inmates thereafter performed Salaah on their sectioned recreation courts without incident. *Id*. ¶ 11.  In mid-June 2007, when defendants (and other administrative personnel) observed plaintiff and other Muslim inmates individually performing their Salaah, plaintiff was told that he could not perform Salaah in the recreation yard and was threatened with disciplinary action under DOCS Rule # 106.10 for refusing a direct order if he did so.  *Id*.

In June 2007, plaintiff filed a grievance complaining that the policy prohibiting performance of Salaah in the recreation yard was arbitrary and in violation of New York State Corrections Law, especially when performance of Salaah did not create any sort of disturbance to the safety or security of the facility.  Am.Compl. ¶ 12; *see also* Dkt. No. 6-1 at 59 (Ex. G). Plaintiff also asked that he no longer be threatened with disciplinary action against him for praying Salaah in the recreation yard.  Am.Compl. ¶ 12.  Also in June 2007, plaintiff wrote to Brian Fischer, Commissioner of DOCS, and Anthony Annucci, Deputy Commissioner/Counsel of DOCS, regarding the alleged violation of plaintiff's right to freely practice his religion at Clinton. *Id*. ¶ 13; *see also* Dkt. No. 6-1 at 48-57 (Exs. E, F).  John H. Nuttall, Deputy Commissioner of Program Services for DOCS, responded to plaintiff's letter on behalf of Commissioner Fischer, stating that "per the Department of Correction Services Directive #4202, Religious Programs and Practices, K. Prayer or Devotions, the Superintendent determines the areas where religious worship may occur."  Dkt. No. 6-1 at 52.  Anthony Annucci also responded to plaintiff's letter, advising plaintiff that the issues raised by plaintiff were outside the jurisdiction of his Office and telling plaintiff that issues raised would be more properly addressed within the context of the

4

Inmate Grievance Program at his facility.  Dkt. No. 6-1 at 57.  In June 2007, plaintiff, acting in his position as an Inmate Liaison Committee ("ILC") representative, placed on the ILC-Superintendent's meeting agenda the issue of Clinton's policy of refusing to allow Muslim inmates to pray Salaah in the recreation yard when the required time to pray Salaah coincided with the allotted recreation period.  Am.Compl. ¶ 14; *see also* Dkt. No. 6-1 at 62 (Ex. H).

On July 4, 2007, plaintiff filed a grievance challenging the Clinton policy which prohibited praying Salaah in the recreation yard and Clinton's failure to otherwise accommodate Muslim inmates' need to pray Salaah at designated times.  Am.Compl. ¶ 15.  On July 10, 2007, the IGRC denied plaintiff's grievance, advising plaintiff that demonstrative prayer was only permitted in the inmate's cell and in designated religious areas as determined by the Superintendent.  Dkt. No. 6-1 at 66 (Ex. J).  Plaintiff appealed the July 10, 2007, decision to defendant Artus.  *Id.*  On July 26, 2007, defendant Artus denied plaintiff's appeal, stating that "individual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters or in designated religious areas whenever feasible, and that congregate or group prayer may only occur in designated religious areas during a religious service.  Therefore, per Department Policy, no demonstrative prayer will be allowed in the North Yard."  Am.Compl. ¶ 17, Dkt. No. 6-1 at 70 (Ex. K).  Plaintiff appealed defendant Artus's decision to the Central Office Review Committee ("CORC"), which unanimously denied plaintiff's appeal on September 12, 2007, "as without merit."  Am.Compl. ¶ 18; *see also* Dkt. No. 6-1 at 71 (Ex. K).

### 2.    Upstate Correctional Facility (Congregate Religious Services)

On November 6, 2007, plaintiff was transferred from Clinton to Upstate Correctional Facility ("Upstate").  Dkt. No. 27, Supplemental Complaint ("Supp.Compl.") ¶ 44.  Upstate is a double-celled Special Housing Unit ("SHU") facility.  Supp.Compl. ¶ 45.  Plaintiff was transferred

to Upstate as a result of being found guilty of a disciplinary infraction and sentenced to a term of fourteen months in SHU.  *Id.*  On December 26, 2007, the sentence was modified on appeal to six months in SHU.  *Id.*  Plaintiff's sentence was later reduced by Upstate's Disciplinary Review Committee based upon plaintiff's "positive adjustment."  *Id.*; *see also* Dkt. No. 38-1 at 1.

When plaintiff arrived at Upstate, he wrote to the Chaplain's Office at Upstate requesting an interview with a Chaplain and information regarding religious services at Upstate. Supp.Compl. ¶ 46.  Plaintiff learned that Upstate did not have a Chaplain designated to serve plaintiff's religion, Islam, nor did Upstate have religious materials, such as books and pamphlets, available on Islam.  *Id.*  Upstate did have weekly congregate religious services for general population Muslim inmates, namely Jumu'ah services on Friday afternoons.  *Id.* ¶ 47.  Plaintiff requested a copy of DOCS form # 2175, a Request to Attend Scheduled Religious Services by Keeplocked Inmates, but the form was not available in his housing unit.  *Id.* ¶ 47.  Plaintiff filed a grievance complaining that form # 2175 was not available in the prisoner housing units.  *Id.*; *see also* Dkt. No. 38-1 at 2.  Upstate's IGRC denied the grievance, stating that "attendance at congregate religious services by a SHU inmate is not permitted . . . As such, there is no need for FORM # 2175 to be available to SHU inmates."  Dkt. No. 38-1 at 3.  Plaintiff claims that the IGRC decision is "inconsistent with Directive # 4202, J, which provides that disciplinary cell-confined prisoners may request (via Form # 2175) to attend weekly congregate religious services." Supp.Compl. ¶ 48.  Plaintiff appealed from the IGRC decision; defendant Wood affirmed the decision for the same reasons set forth by the IGRC.  *Id.* ¶ 49; *see also* Dkt. No. 38-1 at 4.

On December 24, 2007, plaintiff wrote to defendant Leonard, and other DOCS' officials, asking if there was any way that plaintiff would be allowed to attend congregate religious services. Supp.Compl. ¶ 50; *see also* Dkt. No. 38-1 at 5-8.  On February 6, 2008, defendant Leonard's office

responded to plaintiff's December 24, 2007 letter, advising plaintiff the "per SHU Directive" plaintiff should direct his request to attend congregate religious services to the Deputy Superintendent of Security.  Supp.Compl. ¶ 60; *see also* Dkt. No. 38-1 at 19.  On February 9, 2008, plaintiff wrote to the Deputy Superintendent of Security at Upstate requesting permission to attend congregate religious services.  Supp.Compl. ¶ 61; *see also* Dkt. No. 38-1 at 21.  On February 14, 2008, Captain Lacey replied to plaintiff on behalf of the Deputy Superintendent of Security, advising that, per Departmental guidelines, SHU inmates could not attend congregate religious services.  Supp.Compl. ¶ 62; *see also* Dkt. No. 38-1 at 22.  On January 15, 2008, defendant Bezio also responded to plaintiff's December 24, 2007 letter, advising plaintiff that pursuant to DOCS Directive 4933, SHU inmates are not allowed to attend congregate religious services.  Supp.Compl. ¶ 53; *see also* Dkt. No. 38-1 at 10.

On January 15, 2008, plaintiff wrote to the IGRC requesting the status of a grievance that he had filed regarding his inability to attend congregate religious services because he was confined in SHU.  Supp.Compl. ¶ 52; *see also* Dkt. No. 38-1 at 9.  By Memorandum dated January 17, 2008, the IGRC informed plaintiff that his grievance complaining that he was barred from attending congregate religious services had not been received, but advised plaintiff that he could resubmit the grievance.  Supp.Compl. ¶ 54; *see also* Dkt. No. 38-1 at 11.  Plaintiff resubmitted his grievance on January 18, 2008.  Supp.Compl. ¶ 55; *see also* Dkt. No. 38-1 at 12-13.  In his grievance (# UST-34109-08), plaintiff stated that he was a Muslim inmate incarcerated in SHU and wished to attend weekly Jumu'ah services at Upstate, arguing that the blanket prohibition against all SHU inmates attending congregate religious services violated his constitutional and statutory rights to freely exercise his religion.  Dkt. No. 38-1 at 12.  Plaintiff requested that he be given permission to attend weekly Jumu'ah services.  *Id.*  The IGRC denied plaintiff's January 18,

2008, grievance.  Supp.Compl. ¶ 56; *see also* Dkt. No. 38-1 at 14.  Defendant Superintendent

Woods affirmed the IGRC decision on appeal, stating that (1) SHU Directive 4933 prohibits

inmates housed in SHU from attending congregate religious services but allows SHU inmates to

possess religious materials in their cell, participate in special meals associated with religious

holidays, and have access to facility Chaplains; (2) Directive 4202 (Religious Programs and

Practices) provides that (a) to the extent possible and consistent with safety and security of the

facility, authorized inmates should be allowed to attend congregate religious services and (b) SHU

inmates are allowed to have various religious books and items in their cell.  Supp.Compl. ¶ 57; *see

also* Dkt. No. 38-1 at 15.  Plaintiff appealed the denial of his grievance to CORC; on March 19,

2008, (after plaintiff had been transferred to Great Meadow) CORC affirmed defendant

Superintendent Wood's decision denying plaintiff's grievance # UST-34109-08.  Supp.Compl. ¶¶

59, 63; *see also* Dkt. No. 38-1 at 16-18 and 23.

   While at Upstate, plaintiff was subject to the behavioral tracking system known as the

Progressive Inmate Movement System ("PIMS") under which an inmate is rewarded for positive

behavioral adjustment.  Supp.Compl. ¶ 82.  There are three levels in PIMS; a level III inmate has

greater freedom of movement without restraint than a level I inmate.  *Id*. ¶¶ 82-83.  Because of his

positive adjustment at Upstate, plaintiff progressed to from a level I inmate to a level III inmate

under PIMS.  *Id.* ¶ 83.  CORC also reduced the length of plaintiff's SHU sentence.  *Id*.

### 3.  Great Meadow Correctional Facility (Prayer in Recreation Yard)

   Plaintiff was transferred out of Upstate on February 22, 2008, and arrived at Great Meadow

on February 25, 2008.  Supp.Compl. ¶ 64.  While at Great Meadow, plaintiff was not allowed to

pray Salaah in the recreation yard and was not provided with a "religiously acceptable alternative"

to accommodate his need to pray Salaah at the prescribed time.  Supp.Compl. ¶ 65.  Plaintiff filed

a grievance (#GM-45,381-08) on March 25, 2008, claiming that he was being denied his right to freely exercise his religion because he was prohibited from performing his daily prayer in the recreation yard and told that if he did perform demonstrative prayer, he would receive a misbehavior report.  Supp.Compl. ¶ 66; *see also* Dkt. No. 38-1 at 24-26.  Plaintiff asked that "the facility Superintendent and Muslim, Imam (Elmi) establish an appropriate place for [plaintiff] to perform [his] daily prayer when [he is] not able to perform them while in [his] living quarters."  Dkt. No. 38-1 at 24.  The IGRC at Great Meadow recommended that the facility superintendent look into the feasibility of allowing the performance of Islamic daily prayer in an appropriate area at the prescribed times when prayer cannot be performed in the living quarters.  Dkt. No. 38-1 at 27.  On appeal, Superintendent Rock denied plaintiff's grievance.  Supp.Compl. ¶ 68.  Plaintiff appealed defendant Rock's decision to CORC.  Supp.Compl. ¶ 69; *see also* Dkt. No. 38-1 at 29-32.  On May 28, 2008, CORC upheld defendant Rock's decision which denied grievance #GM-45,381-08.  Supp.Compl. ¶ 71.

On May 6, 2008, defendant LaPolt, Deputy Superintendent of Programs at Great Meadow, advised plaintiff that since he could pray in a non-demonstrative manner in the recreation yard, plaintiff was able to meet his religious obligations and did not need religious accommodation.  Supp.Compl. ¶ 70; *see also* Dkt. No. 38-1 at 94.  Plaintiff wrote to Great Meadow Chaplain, Imam Elmy, seeking guidance on whether non-demonstrative prayer would fulfill plaintiff's obligation to perform Salaah and whether Imam Elmy told defendants LaPolt and Rock that the non-demonstrative prayer would suffice.  Supp.Compl. ¶ 72.  On June 17, 2008, plaintiff met with Imam Elmy, who advised plaintiff that he did not give defendants LaPolt and Rock authorization to advise plaintiff that the non-demonstrative prayer would meet plaintiff's religious obligation to pray Salaah and also told plaintiff that the non-demonstrative prayer would not suffice to meet

9

plaintiff's religious obligation to pray Salaah.  *Id.* ¶ 73.

### 4.    DOCS Policies Regarding Inmate Religious Practices

The sections of the DOCS Directives relevant to the pending motions follow.

New York State DOCS Directive 4202(K) reads as follows:

1.    Individual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters and in designated religious areas whenever feasible as determined by the Superintendent.

2.    Congregate or group prayer may only occur in a designated religious area during a religious service or at other times authorized by the Superintendent.

Dkt. No. 87-2 (Ex. E).

New York State DOCS Directive 4933 § 304.9, which applies only to SHU inmates,

provides:

(a)    Counseling by a member of the facility's ministerial services staff will be provided upon written request of an inmate.

(b)    The facility senior chaplain or a designated member of the ministerial services staff will be required to make a minimum of one round per week in SHU.

(c)    No inmate religious advisor or assistant will be permitted to visit SHU.

(d)    Attendance at congregate religious services will not be permitted.

Dkt. 87-2 (Ex. H).


## II.  PROCEDURAL HISTORY

Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 by filing a

complaint on October 29, 2007.  Dkt. No. 1.  On November 5, 2007, plaintiff filed an amended

complaint as of right pursuant to Federal Rule of Civil Procedure 15(a).[3]  Am.Compl.  The

---

[3]  The amended complaint replaced and superceded the original complaint.  *See Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998) (noting "an amended complaint ordinarily supercedes the original and renders it of no legal effect") (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)).

amended complaint alleged that defendants Artus and Turner denied plaintiff the right to perform his Salaah in the recreation yard at Clinton.  *Id*.  The amended complaint requested monetary damages as well as declaratory and injunctive relief.  *Id*.  Defendants Artus and Turner filed an answer to the amended complaint.  Dkt. No. 18.  Plaintiff thereafter filed a supplemental complaint adding new defendants to this action, namely Fischer, Perlman, Leonard, Bezio, Woods, Rock, and LaPolt.  Supp.Compl.  In the supplemental complaint, plaintiff claimed that defendants refused to allow plaintiff to attend congregate religious services (Jumu'ah) while he was confined in the SHU at Upstate and denied plaintiff the right to perform his Salaah in the recreation yard at Great Meadow.  *Id*.  The supplemental complaint requested monetary relief.  *Id*.  Defendants Fischer, Perlman, Leonard, Bezio, Woods, Rock, and LaPolt filed an answer to the supplemental complaint. Dkt. No. 50.  Construed liberally, plaintiff's amended complaint and supplemental complaint together allege that defendants violated his rights under (1) the Free Exercise Clause of the First Amendment; (2) the Establishment Clause of the First Amendment; (3) the Fourteenth Amendment's Equal Protection Clause; (4) RLUIPA; (5) RFRA; and (6) various state laws, regulations, and administrative policies.

Presently before the court are two dispositive motions.  Defendants have filed a motion for summary judgment pursuant to FED. R. CIV. P. 56.  Dkt. No. 87.  In support of their motion for summary judgment, defendants argue that (1) plaintiff cannot establish that he was denied the right to freely practice his religion in violation of the First Amendment; (2) plaintiff's First Amendment Establishment Clause claim fails as a matter of law; (3) plaintiff has not been denied his rights under the Equal Protection Clause of the Fourteenth Amendment; (4) plaintiff's claims under RLUIPA fail as a matter of law; (5) defendants are entitled to qualified immunity; (6) plaintiff cannot demonstrate that defendants Fischer, Leonard, and Perlman were personally involved in

11

any of the alleged constitutional or statutory violations; (7) plaintiff's RFRA claims should be dismissed because RFRA has been declared unconstitutional; (8) plaintiff's claims that defendants violated New York state law or regulations should be dismissed as not actionable under Section 1983; and (9) some of plaintiff's claims for injunctive and declaratory relief should be dismissed as moot.  Dkt. No. 87-4.  As part of their motion, defendants have submitted (1) the transcript of plaintiff's deposition testimony; (2) a declaration from each defendant; (3) DOCS Directives 4202 and 4933; (4) various interdepartmental correspondence addressed to plaintiff; and (5) the Central Office Review Committee decision denying plaintiff's grievance number CL-55183-07.  Dkt. No. 87-2.

Plaintiff has submitted a response in opposition to defendants' motion for summary judgment.  Dkt. No. 91.  As part of that response, plaintiff indicates that he wishes to withdraw all of his claims asserted under (1) the First Amendment Establishment Clause; (2) the Equal Protection Clause; (3) RFRA; and (4) all state law claims.  *Id*. ¶ 6.  Plaintiff indicates that he only wishes to pursue his claims brought pursuant to the First Amendment Free Exercise Clause and RLUIPA.  *Id*. ¶ 7.  Plaintiff has also filed a motion for partial summary judgment pursuant to FED. R. CIV. P. 56 which seeks summary judgment on his remaining claims.  Dkt. No. 93.  Defendants have filed a reply to plaintiff's response. Dkt. No. 90.  Defendants also oppose plaintiff's motion for partial summary judgment.  Dkt. Nos. 94, 102.  Plaintiff has replied to defendants' opposition to his motion.  Dkt. Nos. 97, 104.

Plaintiff also submitted two motions for injunctive relief.  Dkt. Nos. 105, 109.  Defendants oppose the first motion.  Dkt. No. 106.  Plaintiff replied to defendants' opposition.  Dkt. No. 107.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir. 1983) (citing *Adickes v. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). At that point, the nonmoving party must move forward with "specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587.

## IV.  CLAIMS WITHDRAWN BY PLAINTIFF

In his response to defendants' motion, plaintiff expressed his intention to withdraw all of his claims brought under (1) the First Amendment Establishment Clause (Am.Compl., Count 2 and Supp.Compl., Count 6); (2) the Equal Protection Clause (Am.Compl., Count 3); (3) RFRA; and (4) state law. Dkt. No. 91 ¶ 6. Plaintiff cannot unilaterally withdraw his claims without a Court Order, because an Answer (as well as a motion for summary judgment) have already been filed. FED. R. CIV. P. 41(a)(1)(A)(i). To the extent that the Court could liberally construe plaintiff's withdrawal of his claims as a request for a Court Order dismissing those claims *without prejudice* "on terms that the court considers proper" pursuant to FED. R. CIV. P. 41(a)(2), the Court denies that request based on a finding that a dismissal *with prejudice* is more appropriate. This is because (1) defendants have expended the time and effort to file a motion for summary judgment

13

requesting the dismissal of those claims, and (2) the Court, having independently reviewed the merits of the claims that plaintiff seeks to withdraw, agrees with the reasons set forth in defendants' memorandum of law that the those claims have no merit.[4]  Accordingly, pursuant to plaintiff's request, and for the reasons set forth above,  plaintiff's claims brought pursuant to (1) the First Amendment Establishment Clause; (2) the Equal Protection Clause; (3) RFRA; and (4) state law are dismissed **with prejudice**.  *See also Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009) (granting summary judgment with respect to claims withdrawn by plaintiff).

The only claims remaining are plaintiff's allegations that defendants violated his First Amendment right to freely exercise his religion and his free-exercise rights under RLUIPA.  In light of this, defendants' motion for summary judgment and plaintiff's motion for partial summary judgment address identical claims, therefore the Court will review the motions jointly.  Each side is arguing that, as to the claims remaining in this action, there are no questions of material fact and therefore each side argues that it is entitled to judgment as a matter of law.


## V.  PLAINTIFF'S RELIGIOUS CLAIMS

Plaintiff asserts two separate claims with respect to violations of his religious rights. Plaintiff claims that his rights have been violated because he has been prohibited from praying Salaah in the prison yard during his designated recreation period at both Clinton and Great Meadow.  Plaintiff also asserts that he was denied the ability to attend Jumu'ah services while he

---

[4]  The claims withdrawn lack merit because, among other things: (1) plaintiff has demonstrated that defendants' actions violated the Establishment Clause of the First Amendment; (2) plaintiff has not established that, for purposes of the Equal Protection clause, he was treated any differently than any member of another religion; (3) RFRA was declared unconstitutional by the Supreme Court in 1997 and was amended by the RLUIPA, *see Hamilton v. Smith*, No. 06-CV-805, 2009 WL 3199531, at *1, n.3 (N.D.N.Y. Jan. 13, 2009) (citation omitted); and (4) a violation of a state law or regulation, in and of itself, does not give rise to liability under Section 1983, *see Doe v. Conn. Dep't of Child and Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990).

14

was confined in SHU.  Plaintiff asserts these claims under both the First Amendment Free Exercise Clause and RLUIPA.

It is well-settled that inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion.  *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns.  *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).  As more fully discussed below, the analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78, 84 (1987).  This framework is one of reasonableness and is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."  *Ford*, 352 F.3d at 588 (citations omitted).

As to a First Amendment claim, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is "reasonably related to legitimate penological interests."  *O'Lone*, 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89).  An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard.  *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citation omitted).  In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, a court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective."  The Supreme Court established four factors that are relevant to the analysis of whether a regulation is reasonably related to legitimate penological interests:

> (i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities.

*Covino v. Patrissi*, 967 F.2d 73, 78-79 (2d Cir. 1992) (citing *Turner*, 482 U.S. at 89-91. Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiff to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595 (citations omitted).

RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment. *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) (citation omitted). Under RLUIPA, a plaintiff must demonstrate that the state has imposed a substantial burden on the exercise of his religion. . . . *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010). "[T]he state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest. *Id*. RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

RLUIPA was upheld against constitutional challenge in *Cutter v. Wilkinson*, 544 U.S. 709 (2005). In *Cutter*, however, the Supreme Court also stated "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id*. at 722. The Court also stated that RLUIPA permits compelling state interests to outweigh an inmate's claim to a religious accommodation, and while the Act does adopt the compelling state interest standard, "'context matters' in the application of that standard." *Id.* at 722-23. The Supreme Court noted that supporters of RLUIPA in Congress anticipated that courts would apply

this standard "with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'"  *Id.* at 723 (citing Joint Statement S7775 (quoting S. REP. NO.103-111, p.10 1993)).  Lower courts have also held that maintaining security and preserving order are both compelling governmental interests.  *Orafan v. Goord*, 411 F. Supp. 2d 153, 160 (N.D.N.Y. 2006), rev'd on other grounds, *Orafan v. Rashid*, 249 Fed.Appx. 217 (2d Cir. 2007) (citing *Cutter*, 544 U.S. at 723 n.11).  Additionally, "[f]iscal, staffing, and space considerations are part of maintaining security and preserving order."  *Id.* (citing *Marria v. Broaddus*, No. 97 Civ 8297, 2004 WL 1724984, at *2 (S.D.N.Y. Jul. 30, 2004)).

## A.    Sincerely Held Religious Beliefs

As a threshold matter, the Court must determine, under both the First Amendment Free Exercise Clause and RLUIPA, whether a prisoner's particular religious beliefs are entitled to free exercise protection.  *Singh v. Goord*, 520 F. Supp. 2d 487, 498 (RLUIPA), 508 (First Amendment) (S.D.N.Y. 2007).  In this regard, "the relevant inquiry is not whether, as an objective matter, the belief is 'accurate or logical.'"  *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996)).  Rather, the inquiry is whether the plaintiff's beliefs are "'*sincerely held* and whether they are, in his own scheme of things, religious.'"  *Id.* (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)).  A "[s]incerity analysis seeks to determine an adherent's good faith in the expression of his religious belief."  *Patrick*, 745 F.2d at 157 (citing *Int'l Soc. for Krishna Consciousness v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981)).  The test allows the court to differentiate between beliefs that are held as a matter of conscience and those that are motivated by deception or fraud.  *Id.*

Courts recognize that they are "singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs." *Patrick*, 745 F.2d at 157.  Thus, in analyzing this first factor, courts

have rejected an objective, content-based approach "in favor of a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Ford*, 352 F.3d at 588 (citations omitted). The Second Circuit has adopted an "expansive" definition of "religion" as "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *Patrick*, 745 F.2d at 158 (quoting *United States v. Moon*, 718 F.2d 1210, 1227 (2d Cir. 1983)).

As many courts have held, a determination of whether beliefs are "sincerely held" is often a question of fact and requires the court to "delve into the internal workings of [plaintiffs' minds] and assess the credibility of [their] claims." *Patrick*, 745 F.2d at 159; *see also Marria v. Broaddus*, 200 F. Supp. 2d 280, 292 (S.D.N.Y. 2002) (denying summary judgment to defendants in a Five Percenters' case).

In this case, defendants claim that "plaintiff does not specifically allege that he sincerely believes that praying the Salaah and attending Jumu'ah are necessary for his scheme of beliefs." Dkt. No. 87-4 at 13. However, without conceding the point, defendants state that, for purposes of the motions before the Court, they "accept that plaintiff's beliefs are sincerely held." *Id*. Moreover, at his deposition, as well as in his affidavit in support of his motion for partial summary judgment, plaintiff recounted in detail his beliefs under Islaam, including the requirements that he pray Salaah five times daily in a demonstrative manner and attend Jumu'ah services every Friday. *See* Dkt. No. 87-2, Deposition Transcript ("Trans."); *see also* Dkt. No. 93 at 2-3; Dkt. No. 91-9 (Ex A) (outlining the components of a valid prayer). In light of the foregoing, the Court will assume for purposes of this motion that (1) plaintiff is a sincere believer in Islaam and (2) that praying Salaah in a demonstrative manner at the religiously prescribed time and attending Jumu'ah services on a weekly basis are part of his "scheme of beliefs." Having concluded for purposes of this motion that plaintiff's beliefs are sincerely held, the Court must now analyze whether

defendants' conduct or policies created a substantial burden upon those beliefs and whether

defendants, in creating the burden, exercised the least restrictive means in furtherance of a

legitimate penological interest, or in the case of RLUIPA, a compelling governmental interest.

### B.        Substantial Burden

Next, for a claim under both the First Amendment Free Exercise Clause and RLUIPA, a

plaintiff must demonstrate that his or her sincerely held religious beliefs were substantially

burdened by defendants' conduct.  *Singh*, 520 F. Supp. 2d at 498 (RLUIPA), 509 (First

Amendment).[5]  In order to be considered a "substantial burden," the plaintiff "must demonstrate

that the government's action pressure[d] him to commit an act forbidden by his religion or

prevent[ed] him from engaging in conduct or having a religious experience mandated by his faith."

*Muhammad v. City of New York Dep't of Corr.*, 904 F. Supp. 161, 188 (S.D.N.Y. 1995) (citations

omitted).  The burden must be more than an inconvenience, it must substantially interfere with a

tenet or belief that is central to the religious doctrine.  *Id.* (citations omitted); *see also Jones v.*

*Shabazz*, 352 Fed. Appx. 910, 913 (5th Cir. 2009) (holding that a "government action or regulation

only creates a substantial burden on a religious exercise if it truly pressures an adherent to

significantly modify his religious behavior and significantly violate his religious beliefs"); *see also*

*Gill v. Defrank*, No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. Jul. 6, 2000) ("A substantial

burden is more than a mere inconvenience . . . but rather involves, for example, a situation where

an adherent is forced to modify his behavior and violate his beliefs.") (discussing substantial

---

[5]  In *McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004), the Second Circuit had previously declined to reach the question of whether a claim under the Free Exercise Clause, as opposed to RLUIPA, requires a substantial burden on religious exercise.  However, in *Salahuddin*, 467 F.3d at 275, the Circuit stated that a substantial burden was required for a claim under the Free Exercise Clause, even though it indicated that it was *not addressing* the plaintiff's argument that a substantial burden was not required.  *Id.*, 467 F.3d at 274-74, 275 n.5 (noting that plaintiff "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs).  In view of the Second Circuit's statements in *Salahuddin*, this Court finds that a substantial burden on free exercise is required for a plaintiff to make out a claim under the First Amendment Free Exercise Clause.

burden in the context of a First Amendment Free Exercise claim) (citations omitted).

Plaintiff believes that he should be allowed to pray Salaah in the recreation yard when the religiously prescribed time to pray Salaah coincides with the designated recreation period. Plaintiff says that at both Clinton and Great Meadow, he was prohibited from praying Salaah while in the recreation yard as a result of a facility-level policy at each of those facilities.  Am.Compl. ¶ 6; Supp.Compl. ¶ 65.  After filing grievances at both facilities, plaintiff was told that per DOCS Directive 4202, individual demonstrative prayer is only allowed in the privacy of the inmate's cell or in designated religious areas; and that group or congregate prayer may only occur in designated religious areas.  Am.Compl. ¶¶ 15-18; Dkt. No. 6-1 at 70; Supp.Compl. ¶¶ 66-71; Dkt. No. 38-1 at 28.  Plaintiff was further advised that at Clinton and Great Meadow, demonstrative prayer would not be allowed in the recreation yard, but that plaintiff may pray silently and non-demonstratively in the recreation yard. Am.Compl. ¶¶ 15-18; Supp.Compl. ¶¶ 66-71; Dkt. No. 87-5 at 12; Dkt. No. 87-11 at 12.  Plaintiff has testified that demonstrative acts -- namely standing, bowing, sitting, and prostrating -- are essential to praying Salaah and that therefore introspective, non-demonstrative prayer would not suffice to meet his religious obligations.  Trans. at 78[6] (plaintiff testified that "the acts . . . such as standing, bowing, sitting, and prostrating are essential acts that the prayer cannot do without"); Dkt. No. 91-9 at 9; *see also* Dkt. No. 38-1 at 61-93 ("Understanding Conditions, Pillars & Obligations of the Prayer").

Defendants however contend that the referenced DOCS' policies do not create a substantial burden on plaintiff's right to pray Salaah at the prescribed time because plaintiff has other options available to him.  Dkt. No. 87-4 at 13-14.  Defendants assert that plaintiff himself conceded that he was not required to go to the recreation yard during the recreation period, but could choose to

---

[6] When citing to pages in the deposition, the Court will cite the page referenced in the actual deposition transcript rather than to the page referenced in this Court's docket.

remain in his cell where he could freely pray Salaah in a demonstrative fashion.  *Id*. at 14; *see also* Trans. at 47-48; Dkt. No. 87-5 ("Artus Decl.") ¶ 47; Dkt. No. 87-11 ("Rock Decl.") ¶ 56.  Plaintiff also stated that he "[v]ery often" chose to remain in his cell and pray rather than go to the recreation yard.  Trans. at 48.  Defendants also state that plaintiff could attend recreation and then choose to go back to his cell during the designated go back period[7] and thus pray Salaah demonstratively in the privacy of his cell.  *See* Artus Decl. ¶ 48; Rock Decl. ¶ 57.

In contrast, plaintiff argues that his right to pray Salaah is substantially burdened because he is forced to choose between praying Salaah and foregoing recreation, and that the compulsion, though indirect, is a burden just the same.  Dkt. No. 91 at 8.

The question therefore becomes whether having to choose between attending recreation (which includes additional privileges, as more fully described below) or fulfilling his obligation to pray Salaah in a demonstrative manner would substantially burden plaintiff's religious rights.  Although facts produced at trial may show otherwise, the present record, *when viewed in the light most favorable to plaintiff*, shows that plaintiff's free exercise rights were substantially burdened by defendants' policy of requiring plaintiff to either forego his Salaah prayer or give up other privileges accorded him as an inmate.

Plaintiff states that when he was incarcerated in Upstate SHU, he was not allowed to attend Jumu'ah services.[8]  Supp.Compl. at 4-7.  The defendants concede, and the Court agrees, that plaintiff's inability to attend Jumu'ah while housed in SHU substantially burdens his right to attend congregate religious services.  *See* Dkt. No. 87-4 at 13; *see also Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (noting prisoners have a constitutional right to participate in

---

[7]  The designated go back period is a process whereby inmates may return to their cells from the recreation yard under the supervision of staff at a scheduled time.  *See* Artus Decl.  ¶ 49; Rock Decl. ¶ 58.

[8]  Plaintiff has now been transferred back to Upstate.  Dkt. No. 108.

congregate religious services) (citing *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir. 1989)).

### C.        Demonstrative Prayer in the Recreation Yard

#### 1.        First Amendment Free Exercise Clause

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, with respect to a First Amendment free exercise claim, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; 'the burden remains with the prisoner to show that these articulated concerns were irrational.'" *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595).  Although the defendants' burden is "relatively limited," the legitimate penological interest advanced must have been the ***actual*** reason for the defendants' actions.  "Post hoc justifications with no record support will not suffice."  *Id.* at 277.  When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had "a valid, rational connection to a legitimate governmental objective"; (2) whether the prisoner has an "alternative means of exercising the burdened right"; (3) "the impact on guards, inmates, and prison resources of accommodating the right"; and (4) "the existence of alternative means of facilitating [the plaintiff's] exercise of the right that have only a *de minimis* adverse effect on valid penological interests."  *Id.* at 274 (citing *Turner*, 482 U.S. at 90-91).

Defendants contend that their prayer policy has a valid, rational connection to a legitimate penological interest.  In respective affidavits, Superintendent Artus (Clinton) and Superintendent Rock (Great Meadow) listed several reasons for prohibiting demonstrative prayer in the recreation yard, essentially claiming that allowing demonstrative prayer would pose a threat to the safety or security of inmates and guards alike.  Artus Decl.; Rock Decl.  Artus and Rock each state that, in their respective roles as a superintendent of a correctional facility, they are aware of the

penological interests served by banning demonstrative prayer in the prison's recreation yard.

Artus Decl. ¶ 18; Rock Decl. ¶ 25.  The recreational yards at Clinton and Great Meadow are large,

5.5 acres and 5 acres respectively, and have present on any given day a large number of inmates

supervised by a relatively small number of staff.  Artus Decl. ¶¶ 19-21; Rock Decl. ¶¶ 27-28.  On a

typical day at Clinton, the recreation yard has approximately 300 inmates present during the

recreation period, and these inmates are supervised by as few as 10 staff members. Artus Decl. ¶¶

20-21.  At Great Meadow, approximately 100 to 400 inmates are present, supervised by 7 to 9 staff

members depending upon the time of day.  Rock Decl. ¶¶ 27-28.  A large gathering of inmates in

one location presents difficulties in maintaining the facility's safety and security; and large areas

where inmates gather, such as the yard or mess hall "are areas of a facility where unusual incidents

such as serious fights and assaults typically occur."  Artus Decl. ¶¶ 22-23; Rock Decl. ¶¶ 31-32.

Demonstrative prayer is not allowed in the yard because it constitutes a substantial threat to

facility safety and security, as it singles individuals out as members of a particular religious group.

Artus Decl. ¶¶ 25-26; Rock Decl. ¶¶ 34-35.  Identification of an inmate's religious affiliation could

lead to conflicts between different faith groups, or different sects of the same faith group, or could

encourage other inmates to come to the aid of someone of their faith, resulting in escalation of an

individual incident to a larger scale, placing staff and other inmates in danger.  Artus Decl. ¶¶ 29-

35; Rock Decl. ¶¶ 38-44.  "Further, during the confusion created by such incidents, an inmate may

attempt to escape from the facility or inmates may attempt to take over the prison." Artus Decl. ¶

36; Rock Decl. ¶ 45.

Demonstrative prayer also negatively impacts the staff's ability to control inmates.  Artus

Decl. ¶¶ 37-44; Rock Decl. ¶¶ 46-53.  For example, an inmate engaged in demonstrative prayer is

likely to ignore legitimate direct orders from staff or may view any interruption as an insult to his

religion, which might in turn lead to a conflict between the inmate and staff.  Artus Decl. ¶¶ 38-40; Rock Decl. ¶¶ 47-49.  Moreover, "because the inmate's religion has been identified by his demonstrative prayer, other inmates may join in the conflict, rapidly escalating the situation." Artus Decl. ¶ 41; Rock Decl. ¶ 50.  Additionally, a staff member may hesitate to interrupt an inmate engaged in demonstrative prayer out of respect for the inmate's religion, and therefore be "unable to communicate necessary information" to the inmate.  Artus Decl. ¶¶ 42-43; Rock Decl. ¶¶ 51-52.

Based upon their concerns that allowing demonstrative prayer in the yard could lead to conflict or could result in a loss of control over inmates who are praying, defendants assert that "the prohibition of demonstrative prayer in [the] recreation yard[s at Clinton and Great Meadow] is reasonably related to the legitimate penological interest of facility safety and security."  Artus Decl. ¶ 69; Rock Decl. ¶ 82.

Defendants have identified a legitimate penological interest - namely maintaining a safe prison -- to justify the prohibition on demonstrative prayer in the recreation yards at Clinton and Great Meadow.  *See Pell v. Procunier*, 417 U.S. 817, 823 (1974) (stating that "institutional consideration[s] of internal security within the corrections facilities" are "central to all other corrections goals").  The burden now shifts to plaintiff "to show that these articulated concerns [are] irrational."  *Salahuddin*, 467 F.3d at 275.

Plaintiff argues that defendants' asserted interest in prohibiting behavior which might identify an inmate's chosen faith (on the presumption that an inmate's religious identity might lead to conflict) is irrational in light of provisions contained in the very DOCS Directive which defendants use to support their prohibition against demonstrative prayer in the recreation yard. Dkt. No. 91 at 10.  Plaintiff points to DOCS Directive 4202(M), which permits inmates to wear

religious headcoverings in accordance with their religious beliefs.  Dkt. No. 91 at 10; *see also* Dkt. No. 87-2 at 129-30, DOCS Directive 4202(M).  For example, an inmate of the Jewish faith may wear a Yarmulke; a Rastafarian may wear a Tsalot-Kob; and a Muslim inmate may wear a Kufi.  Dkt. No. 91 at 10; DOCS Directive 4202(M).  Plaintiff further points out that these headcoverings may be worn throughout the day, which would include in the recreation yard.  *Id.*  Plaintiff states that adherents of other religions are also easily identifiable by other means.  For example, only Rastafarians are allowed to have their hair in dredlocks and certain religions are allowed to grow their beards longer than the general one inch length restriction.  *Id*. at 10-11.  Plaintiff also points out that Jewish inmates receive their kosher meals on different colored trays in the mess hall -- a location that defendants identified as a highly populated area prone to disturbances (which defendants claim might arise upon identification of inmate's religion).  *Id*. at 11.  Finally, plaintiff argues that by virtue of socialization alone (within the housing units, in classes, and during work assignments), and by observing another inmate's comings and goings (leaving the housing unit during a particular religious service or observance), inmates frequently know the religious designation of other inmates.  *Id*.

In response to defendants' assertion that correctional officers will lose control over inmates who are allowed to pray demonstratively, plaintiff argues that this concern is also irrational.  Dkt. No. 91 at 11-12.  First, plaintiff says that defendants "have not explained how this would be any different for a person praying 'introspectively, devoid of symbolism,' which they assert all can pray throughout the facility."  *Id*. at 11.  Plaintiff further contends that a person praying introspectively would present a greater risk than a person praying demonstratively because there is nothing to alert a correctional officer that the person ***is praying***, "thereby an unwitting person may more likely disrupt them or give an order (and thus penalize them for not responding), than to one

25

praying demonstratively by which they knew he was praying."  *Id*. at 12.  Plaintiff also argues that

other activities in the recreation yard (such as sports and table games) have led to conflict in the

yard, yet those activities are not banned.  Dkt. No. 93 at 27.

Additionally, plaintiff asserts that the policy in place at Clinton and Great Meadow is

unreasonable because inmates are allowed to pray in recreation yards in other New York state

facilities.  Dkt. No. 91 at 13-14; Dkt. No. 93-2 at 43.  Plaintiff testified that at Attica Correctional

Facility ("Attica"), inmates are allowed to pray demonstratively in the yard, in groups of five, if

they do so off to the side of the yard, near the wall.  Trans. at 64-65; *see also* Dkt. No. 91-1 at 35-

39.  Plaintiff also testified that when he was at Sing Sing as recently as 2005, he was allowed to

pray in the yard, "individually . . . off to the side, and it didn't create a disturbance."  Trans. at 50;

Dkt. No. 93-2 at 43.  Plaintiff also states that he was previously allowed to demonstratively pray in

the Clinton recreation yard.[9]  Trans. at 51.  The Court finds it noteworthy that defendants have not

responded to this statement, either by denying that inmates were previously allowed to pray

demonstratively, or if they were previously allowed to pray demonstratively in the yard, by

explaining what brought about the change.  Finally, plaintiff provides affidavits from other inmates

who aver that they have been allowed to pray demonstratively during outdoor recreation at other

facilities.  *See* Dkt. No. 91-1 at 23-26 (affidavits from three different inmates stating that Muslim

inmates are allowed to pray Salaah in the recreation yards, with all its movements and postures, at

Sing Sing, Five Points Correctional Facility, Eastern Correctional Facility, and Attica).  One of the

inmate affidavits submitted states that at Auburn Correctional Facility, when prayer time coincided

with outdoor recreation, the Muslim Chaplain and administration of that facility made an

---

[9]  Plaintiff testified that when he first arrived at Clinton, he prayed several times in the recreation yard
without incident. Trans. at 51.  Plaintiff stated that "[s]ome officers [at Clinton] don't mind. Some officers adhere to
what the policy was before."  *Id.*

arrangement whereby an announcement was made over the loudspeaker that Muslim inmates could be escorted from the recreation yard to the mess hall to pray. Dkt. No. 91-1 at 24-25. The fact that other facilities allow inmates to pray demonstratively in the recreation yard is not necessarily instructive in this case, since DOCS Directive 4202 leaves it to each individual superintendent to determine where in his or her own facility demonstrative prayer should be allowed. That being said, defendants have not come forward with some credible evidence to justify the prohibition *at Clinton and Great Meadow*. For example, defendants have not shown that the lay-out, staffing, etc. at Clinton or Great Meadow differ from the lay-out, staffing, etc. at those facilities where demonstrative prayer is allowed in the recreation yard. Plaintiff has thus raised at least an inference that defendants' security concerns are irrational in light of the fact that other facilities are able to accommodate demonstrative prayer in the prison yard. Additionally, plaintiff argues that defendants' concerns for safety and security are conclusory and speculative and that "the hypothesized potential of security concerns are too remote to outweigh religious freedoms." Dkt. No. 91 at 12.

Although facts produced at trial may show otherwise, the present record, *when viewed in the light most favorable to plaintiff*, shows that plaintiff's free exercise rights were substantially burdened by the prayer policy in place at Clinton and Great Meadow. Although defendants have asserted that the policy is justified by a legitimate penological interest, plaintiff has put forth enough evidence for a reasonable jury to conclude that defendants' concerns are irrational or are an exaggerated response to those concerns. Plaintiff has not however submitted sufficient evidence for the Court to conclude as a matter of law that defendants cannot justify their policy on the record at trial. Neither party has carried its burden on this first *Turner* factor, namely whether there is a valid, rational connection between the prison regulation and the legitimate governmental

interest put forward to justify it.

Notwithstanding the refusal to allow demonstrative prayer in the recreation yard, defendants state that inmates wishing to pray during the recreation period have several alternatives.  Plaintiff argues that the alternatives suggested by the defendants are neither reasonable nor the least restrictive means of accommodating his free exercise rights with respect to praying Salaah.  Dkt. No. 91 at 15-17.

First, defendants state that inmates may make silent, non-demonstrative prayer in the recreation yard.  Artus Decl. ¶ 46; Rock Decl. ¶ 55.  Plaintiff has testified that praying Salaah without the required movements does not fulfill his obligation to conduct the prayer, as the various movements are integral and essential aspects of the prayer.  Trans. at 53, 56-57; *see also* Am.Compl. ¶ 27.  For example, plaintiff testified that "the prayer is broken into things that are called pillars that [are] essential like a building has its foundation, its pillars, it can't do without . . . The acts that they talk about, such as standing, bowing, sitting, and prostrating are essential acts that the prayer cannot do without."  Trans. at 57.  When asked, "So the prayer is invalid without those acts?" plaintiff responded, "Yes."  *Id.*  Plaintiff has also submitted a portion of a book describing the manner in which Salaah is to be performed.[10]  Dkt. No. 38-1 at 61-95.  Defendants have presented no evidence, such as testimony from an expert on Islaam and its practices, that silent, non-demonstrative prayer would suffice to fulfill plaintiff's religious obligation to pray Salaah.  There remains a question of fact as to whether silent, non-demonstrative prayer is a reasonable alternative.

Defendants also suggest that inmates may remain in their cell during the recreation period, forgoing recreation, since they may pray demonstratively in the privacy of their own cell.  Artus

---

[10]  Plaintiff also cites *Chatin v. State*, No. 96 Civ. 420, 1998 WL 196195, at *2 (S.D.N.Y. Apr. 23, 1998), which contains in the findings of fact, a description of the requirements for Muslim prayer.

Decl. ¶47; Rock Decl. ¶ 56; *see also* DOCS Directive 4202(K) (providing that individual

demonstrative prayer will be allowed in the privacy of an inmate's own living quarters).  At his

deposition, plaintiff stated that although he is not required to attend recreation, he is faced with

"the dilemma to . . . [e]ither attend recreation, because [inmates] are supposed to be mandated a

minimum of one hour recreation by correctional law, you know . . . so we are forced with the

dilemma of either partaking the one hour recreation or prayer, so you give up one right."  Trans. at

47-48.  Plaintiff states that going to the recreation yard carries with it other privileges apart from

exercise and socialization.  Dkt. No. 91 at 7-8.  For example, during recreation, inmates are

afforded access to phones located in the yard, an opportunity to take an additional shower, and are

exposed to fresh air.  *Id*.  Plaintiff states that because he suffers from asthma, the opportunity for

fresh air is particularly important to him.  *Id*.  Plaintiff also contends that his "choice" is tempered

by the threat of disciplinary action, namely, if he chooses to go to the recreation yard, he goes to

the yard under the threat that he will receive a disciplinary ticket if he attempts to pray

demonstratively.  *Id.*  Punishment for such an infraction could result in various sanctions including

a loss of privileges, removal from programs, monetary sanctions, and a permanent strike on the

prison record (which would be considered by the parole board and the Time Allowance

Committee).  *Id*.

In *Sherbert v. Verner*, 374 U.S. 398 (1963), the plaintiff was put in the position of choosing

to exercise her religious beliefs (which required her to not work on Saturdays) or forfeiting her right

to receive unemployment benefits.  The *Sherbert* court found that "[g]overnmental imposition of

such a choice puts the same kind of burden upon the free exercise of religion as would a fine

imposed against appellant for her Saturday worship."  *Sherbert*, 374 U.S. at 404.  In the case at

hand, plaintiff argues that, although he has the option to remain in his cell during recreation, this

option forces him to choose between praying Salaah demonstratively in his cell but forfeiting his recreation yard benefits on the one hand, or on the other hand, abandoning his Salaah in order to exercise, use the phone, take an extra shower, and enjoy some fresh air.  Dkt. No. 91 at 8. Construed liberally, plaintiff seems to argue that this *choice* puts him between a rock and a hard place, essentially offering him two equally unpleasant alternatives.  In accordance with *Sherbert*, a reasonable juror could conclude that giving plaintiff the choice between prayer or recreation puts pressure on plaintiff to forego his religious practices.  As such, absent further evidence to the contrary, defendants have not proven that this is a reasonable alternative.[11]

Finally, defendants state that inmates may return to their cell during the designated "go back" period and then pray demonstratively in their cell.  Artus Decl. ¶¶ 48-49; Rock Decl. ¶¶ 57-58.  Plaintiff says that the early go back at Clinton and Great Meadow also does not provide a reasonable alternative to allowing plaintiff to pray in the recreation yard.  Dkt. No. 91 at 15. Plaintiff states that there are times when the go back period occurs *after* the time to make his prayer has passed.  Trans. at 47.  Plaintiff also testified that unforeseen circumstances can sometimes delay the go back period.  For example, if a fight breaks out during recreation, the go back may be delayed or may not occur at all.  *Id*. at 48-49.  Defendants have not responded to these concerns.

Plaintiff has raised sufficient factual issues regarding the reasonableness of the alternatives available to him to pray Salaah at Clinton and Great Meadow.

The Court must also consider the impact that an accommodation would have on prison guards, other inmates, and the allocation of resources.  In this case, defendants assert that changing the current policy regarding demonstrative prayer in the yard would pose a threat to prison security.

---

[11]  While of course an inmate may at times be required to choose between two separate and distinct privileges, as must we all, defendants have failed to submit sufficient evidence to show that, as a matter of law, the alternatives that they suggest are the least restrictive means of accommodating plaintiff's religious free exercise.

However, as discussed *supra*, defendants have not met their burden of proving that the prayer policy instituted at Clinton and Great Meadow is a "rational" response to their security concerns. Defendants have therefore failed to meet their burden on this third factor as well. Conversely, plaintiff has not demonstrated to a legal certainty that a change in policy would not have an adverse impact upon guards, inmates, and prison resources.

Finally, the Court must consider the possibility of alternatives. "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. at 91. Plaintiff has suggested several ways to accommodate his need to pray Salaah during recreation, each of which defendants claim are untenable.

First, plaintiff suggests that at both Clinton and Great Meadow, an additional go back period could be arranged for Muslim inmates to coincide with their prescribed prayer time. Dkt. No. 91 at 18; Supp.Compl. ¶ 90; Trans. at 78. Defendants state that this option would either create a threat to the safety and security of inmates and guards in the recreation yard, or would be cost prohibitive. Inmates must be escorted while they are transported from the recreation yard to and from their cells. Artus Decl. ¶ 51; Rock Decl. ¶ 60. Defendants contend that escorting Muslim inmates back and forth to their cells during a special, additional go back period would reduce the number of guards available in the recreation yard at a given time, creating risks for both staff and inmates. Artus Decl. ¶¶ 53-54; Rock Decl. ¶¶ 62-63. A diminished number of correctional officers in the yard would create security concerns. Artus Decl. ¶¶ 55-56; Rock Decl. ¶¶ 64-65. Correctional officers would be unable to appropriately respond to an incident; for example, correctional officers may be unable to subdue inmates engaged in violent confrontation. Artus

31

Decl. ¶¶ 57-59; Rock Decl. ¶¶ 66-68.  To avoid the diminishment of staff in the yard during the extra go back period, each facility would have to hire additional correctional officers, or pay current correctional officers overtime, creating substantial fiscal concerns for the facilities.  Artus Decl. ¶¶ 60-61; Rock Decl. ¶¶ 70-71.  The Court finds that defendants have provided sufficient evidence to demonstrate that *this alternative* would have a negative impact upon prison security and the fiscal resources available to the facility, and that the impact would not be *de minimis*.

Plaintiff suggests that, at Clinton, inmates could be allowed to pray the Salaah "on the sectioned recreation courts."  Am.Compl. ¶ 24; *see also* Dkt. No. 91 at 18; Am.Compl., Ex. A (plaintiff's request for reasonable accommodation).[12]  Plaintiff testified that you can become a member of a sectioned recreation court at Clinton by signing up in the sergeant's office and that members can invite anyone they want to their court, as long as there are no more than six inmates on the private court at any one time.  Trans. at 40.  Plaintiff argues that what goes on in these individual courts would not interfere with the rest of the yard.  *Id*. at 39-40.  At Great Meadow, plaintiff suggests that inmates could be allowed to pray on the fenced in, unused basketball court.  Trans. at 75; Supp.Compl. ¶ 93.  Plaintiff alleges that "the recreation yard [at Great Meadow has] enough area for one to pray his Salaat without incident, and video footage of said yard during recreation would verify this point."  Supp.Compl. ¶ 93.

Defendants argue that these options are not viable because allowing inmates to pray demonstratively on the sectioned recreation courts or a fenced in, unused basketball court would lead to the same security concerns presented in the recreation yard as a whole, i.e., inmates' religious designations would be identified and staff would have diminished control over inmates

---

[12]  Plaintiff's request was denied by defendant Turner.  Dkt. No. 87-12 at 8.  In denying the request, defendant Turner referred to that part of DOCS Directive 4202 which states: "Congregate or group prayer may only occur in a designated religious area during a religious service or at other times authorized by the Superintendent."  *Id.*

praying demonstratively, leading to conflict, violent incidents, and possible loss of control over the yard.  Artus Decl. ¶¶ 63, 66-67; Rock Decl. ¶¶ 72-75.  The Court has already concluded, *supra*, that these concerns have not been sufficiently supported on the record to justify the prayer policy in place at Clinton and Great Meadow.  Therefore a question of fact remains as to the feasibility of these options.

Additionally, defendant Rock states that "designation of a specific area of the recreation yard for demonstrative prayer purposes creates territorial issues between different groups of prisoners . . . These territorial issues present a serious risk to facility staff and security because they could lead to conflict between different groups of inmates."  Rock Decl. ¶¶ 76-77.  In the case of Great Meadow, Rock states that allowing inmates to use the fenced in, unused basketball court for demonstrative prayer would create staffing and fiscal concerns because "[a]dditional correction officers would need to be assigned to supervise the fence and the actual special area designated for demonstrative prayer.  Accordingly, more staff would have to be hired or staff would need to be diverted from the main yard, potentially causing understaffing and increased risks to facility safety and security."  Rock Decl. ¶¶ 78-80.  Plaintiff argues that territorial issues should not be a concern because admittance to the assigned courts at Clinton or the unused basketball court at Great Meadow would only be by permission.  Dkt. No. 91 at 19.

Based on the record before it, this Court cannot find as a matter of law that the pray policy in place at Clinton and Great Meadow is rationally related to legitimate penological interests or that it is the least restrictive alternative that could be offered.

### 2.    RLUIPA

The issue under RLUIPA is whether the defendants' prayer policy at Clinton and Great Meadow is justified by a compelling state interest and whether the policy is the least restrictive

method for achieving those interests.

The defendants in this case allege that there are concerns for security, as well as staffing and fiscal concerns, associated with accommodating plaintiff's request to pray demonstratively during the recreation period.  It has been held that simply raising the "specter" of security is not sufficient to outweigh the inmates' interests.  *See Spratt v. R.I. Dep't of Corrs.*, 482 F.3d 33, 38-39 (1st Cir. 2007).  In *Spratt*, the inmate wished to "preach" to inmates.  *Id.* at 35.  He had been ordained as a minister in the Universal Life Church, and the prison chaplains began allowing plaintiff to preach to inmates during weekly services.  *Id.*  Although there had been no problems with plaintiff's activities for seven years, the defendants in *Spratt* suddenly decided that he could no longer engage in his preaching activities.  *Id.* at 35.  The lower court dismissed the action as to claims of Constitutional violations as well as RLUIPA.  *Id.*  Spratt appealed only the denial of the RLUIPA claim.  *Id.*

The defendants' reasoning in *Spratt* included allegations that allowing inmates to be in actual or perceived leadership could be a threat to security.  *Id.* at 36-37.  Spratt argued that defendants' response was exaggerated and based on speculation, offering to submit to facility supervision of his preaching activities.  *Id.* at 37.  The First Circuit found under RLUIPA that Spratt's religious exercise, which included preaching, was substantially burdened and found that the defendants' response was not the least restrictive means of achieving their compelling state interest of security.  *Id.* at 39.  The court found that, other than citing one non-relevant case, the defendants in *Spratt* had not met their burden of showing that having inmates in a "leadership" position endangered security, and that defendants had not shown that they had considered and rejected the efficacy of less restrictive measures before adopting the *blanket ban* on inmate preaching.  *Id.* at 40-41.  In making this decision, however, the court did note that RLUIPA does

34

not require prison administrators to refute "every conceivable option in order to satisfy the least restrictive means prong" of the statutory test. *Id.* at 41 n.11 (quoting *Hamilton v. Schriro*, 74 F.3d 1545, 1556 (8th Cir. 1996)

This case is not distinguishable from *Spratt*. Defendants here, as in *Spratt*, have not met their burden of showing that allowing inmates to prayer demonstratively during the recreation period endangered security. While it is certainly reasonable that defendants would want to ensure the safety and security of their inmates and correctional officers, notwithstanding these articulated concerns, as more fully discussed *supra* in Section V.C.1., defendants have not produced concrete evidence that the concerns are justified, but instead merely *speculate* as to what types of dangers *might* arise if an inmate is allowed to demonstratively pray in the recreation yard. Nor have defendants met their burden that their fiscal and staffing concerns amount to a compelling state interest. Moreover, even if defendants could establish a compelling state interest which would support prohibiting demonstrative prayer in the recreation yard, defendants have not demonstrated, as a matter of law, that their policy is the least restrictive means that could be employed to further that interest. In fact, plaintiff has proposed alternatives which a reasonable juror could conclude would have a *de minimis* impact on the facility as a whole. *See supra*, Section V.C.1. Conversely, however, plaintiff has not established as a matter of law that there can be no compelling governmental interest to support the policy. Accordingly, neither plaintiff nor defendants are entitled to judgment as a matter of law on the merits of plaintiff's RLUIPA claim which challenges the prayer policy at Clinton and Great Meadow.

### D.   Congregate Services for SHU Inmates

#### 1.   First Amendment Free Exercise

The Second Circuit has "found it well established that a prisoner's free exercise right to

participate in religious services is not extinguished by his or her confinement in special housing or keeplock." *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (citing *Salahuddin v. Coughlin*, 993 F.2d at 308). Thus, in order to limit this right, DOCS must provide a legitimate penological interest.

Pursuant to DOCS Directive 4933 § 304.9, "[a]ttendance at congregate religious services will not be permitted" when an inmate is housed in SHU. *See* Dkt. No. 87-2 (Ex. H). Defendants contend that they have a legitimate penological interest in implementing the policy which prohibits inmates confined in SHU from attending congregate religious services. Defendant Bezio, DOCS Director of Special Housing/Inmate Disciplinary Programs, has submitted an affidavit outlining the reasons which support denying SHU inmates access to congregate religious services. Dkt. No. 87-6 ("Bezio Decl."). Inmates are assigned to SHU as a result of a disciplinary action (for their failure to comply with DOCS' rules and regulations) or to be segregated from the general population (because their presence in the general population "presents a danger to the safe, secure, and smooth operation of the facility". *Id*. ¶¶ 21-22. Special precautions are required to supervise inmates assigned to SHU. *Id*. ¶ 23. "[A]bsent special circumstances, inmates assigned to SHU are restrained at all times when they are escorted out of their cells, and extra supervision by staff is needed for SHU inmates to ensure facility safety and security." *Id*. ¶¶ 24-25.

PIMS, a  standardized system designed to encourage good behavior by SHU inmates by providing certain privileges for good behavior, is in place at Upstate. Bezio Decl. ¶¶ 27-29. Whenever an inmate enters Upstate, he is classified as a PIMS Level I inmate. *Id*. ¶ 30. If an inmate is to progress from PIMS Level I to PIMS Level II, he must at a minimum have 30 days at Level I status with no disciplinary reports. *Id*. ¶ 31. Movement from PIMS Level II to Level III requires at a minimum that the inmate must remain at Level II for 30 days with no disciplinary

36

reports.  *Id.* ¶ 32.  Certain procedures are in place in Upstate SHU which must be followed when a SHU inmate leaves his cell and is moved either within or outside of SHU.  *Id.* ¶ 33; *see also id.* (Ex. D) Upstate Correctional Facility, Special Housing Unit Manual, Area 16 ("Area 16 SHU Manual").  Each inmate's hands are restrained before he is allowed to leave the cell and upon exiting the cell, his hand restraints are attached to a waist chain.  Bezio Decl. ¶ 34.  The number of correctional officers required to escort a given inmate depends on the inmate's PIMS Level as well as the number of other inmates being escorted at the same time.  *Id.* ¶ 35; Area 16 SHU Manual.  Two correctional officers are always required to escort a PIMS Level I inmate.  Bezio Decl. ¶ 36.  For PIMS Level II or III inmates, two correctional officers are required to escort one to three inmates and three correctional officers are required to escort four to six inmates.  Bezio Decl. ¶ 37; Area 16 SHU Manual at 3.   No more than six PIMS Level II or III inmates may be escorted in one group.  Bezio Decl. ¶ 38; Area 16 SHU Manual at 3.

Congregate religious services at Upstate are conducted outside of SHU.  Bezio Decl. ¶ 40.  To attend services, a SHU inmate would need to be escorted to and from services, as set forth in the Area 16 SHU Manual, and the escort, or escorts, would have to remain with the inmate during services.  *Id.* ¶¶ 41, 48.  Upstate is staffed by about 328 correctional officers who must cover three shifts, 24 hours a day, seven days a week.  *Id.* ¶¶ 43-45.  Muslim services are conducted during the day shift; there are approximately 84 correctional officers assigned to the day shift in Upstate SHU to cover essential services for SHU inmates.  *Id.* ¶¶ 46-47.  There are about 1060 inmates assigned to Upstate SHU, and about 101 of the SHU inmates are identified as observants of Islam, therefore the staff would potentially have to restrain and escort 101 inmates to Jumu'ah services.  *Id.* ¶¶ 42, 50-51.  Additionally, if SHU inmates were allowed to attend congregate religious services, taking into account adherents of other faiths, during the course of a week, correctional officers could be

required to escort all 1060 SHU inmates to various religious services.  *Id.* ¶ 51.  The number of

staff required to escort and intensely supervise SHU inmates for congregate religious services

would "negatively impact institutional order."[13]  *Id.* ¶ 54.  Additionally, DOCS would be forced to

hire additional correctional officers to meet the escort need or pay current staff overtime wages,

which would "present substantial fiscal concerns for DOCS and place a drain on scarce human

resources, especially in the current economic climate."  *Id.* ¶ 55.

Defendant Bezio also states that, based upon his personal experience, having a large

number of inmates in one area increases the possibility of disruptive behavior,[14] therefore DOCS

has established procedures to limit inmates' opportunities to gather in large numbers.  Bezio Decl.

¶¶ 57-61.  SHU inmates are not allowed to attend mess hall or recreation yard because of the risk

that they pose to prison security, but are served meals in their cell and exercise in individual

recreation areas.  *Id.* ¶¶ 62-63.  Congregate religious services are also an activity where a large

number of inmates gather in one location.  *Id.* ¶ 64.  Additionally, Upstate has developed

procedures to ensure that inmates who are known to be enemies are not escorted to the same area

at the same time, such as to medical call-outs.  *Id.* ¶ 65.  Since known enemies may be members of

the same faith, Upstate would face the choice of having known enemies escorted to the same

congregate religious services (which could lead to assaults or other unusual incidents), or in the

alternative, would be forced to conduct numerous services to ensure that known enemies do not

attend services together.  *Id.* ¶¶ 67-70.  The first option would be a threat to facility safety and

---

[13]  As outlined by defendant Bezio, transporting twelve PIMS Level III inmates to Jumu'ah services on a Friday afternoon would require six of the 84 day shift correctional officers to be removed from their posts to stay with the inmates for however long the services lasted.  Since there are approximately 101 Muslim inmates assigned to Upstate SHU, the number of guards required as escorts for each Jumu'ah service would likely be greater.  This is not even taking into account the fact that **each PIMS Level I inmate would require two correctional officers as an escort for services.**  *See* Bezio Decl.

[14]  Defendant Bezio states that large areas where inmates gather, such as the recreation yard or the mess hall, are areas where serious fights or assaults typically occur.  Bezio Decl. ¶ 60.

security; the second option would strain prison resources, both in terms of manpower and finances. *Id*. ¶¶ 67-71.  Finally, Bezio states that most SHU inmates have already demonstrated that they are unable to follow prison rules, therefore allowing them to attend congregate religious services "heightens the risk that an unusual incident will occur" at the service.  *Id*. ¶ 68.

Defendants point out that SHU inmates may still practice their religion by, among other things, praying in their cell, requesting counseling from a member of the ministerial staff, receiving religiously appropriate meals, and possessing certain religious articles and publications.[15] Bezio Decl. ¶¶ 72-77.

Since defendants have provided a legitimate penological interest to justify denying a SHU inmate the ability to attend congregate religious services, the burden shifts to plaintiff to show that the defendants' concerns are "irrational."  Plaintiff points to his progression in the PIMS system from a Level I inmate to a Level III inmate as evidence that his conduct is not a threat to prison security.  Supp.Compl. ¶¶ 82-83.  Plaintiff's lack of disciplinary reports for a period of time may provide some evidence that he, as an individual, is not a threat to prison security.  However, plaintiff has offered no evidence to overcome defendants' asserted penological interest of not straining its manpower to the point where prison security is compromised.  Additionally, plaintiff admits that SHU inmates of all religions, not just Muslim SHU inmates, are denied the ability to attend their respective congregate services.  Trans. at 73.  Plaintiff has failed to carry his burden of establishing that defendants' policies are irrational and has pointed to no alternative which would be compatible with defendants' concerns.

Finally, plaintiff states that he "never sought mandating allowance to attend services by

---

[15]  Plaintiff himself admits that, although Jumu'ah is an essential duty for a Muslim, a Muslim who is prevented from attending Jumu'ah for reasons beyond his control -- such as incarceration -- is not considered to have sinned. Trans. at 71-72.

every SHU prisoner [but r]ather he sought . . . discretionary review and approval as given to other prisoners in segregated confinement (per Dir # 4202[J]).”  Dkt. No. 91 at 23; *see also* Supp.Compl. (Ex. L).  Directive 4202(J) provides, in relevant part that “[a]n inmate in keeplock status . . . may request permission to attend regularly scheduled congregate religious services.”  Dkt. No. 87-2 (Ex. E).  Plaintiff’s argument in this regard is misplaced because, by its plain terms, DOCS Directive 4202(J) applies only to inmates in keeplock.[16]  *Id.*

This Court finds that the enforcement of DOCS Directive 4933 § 304.9(d) is rationally related to a valid penological interest and is the least restrictive means of serving that interest.  *See o’Lone*, 482 U.S. 342 (prison officials did not violate inmate’s right by assigning him to outside work detail that prevented his attendance at congregate religious services, because the rules relating to outside work assignments were reasonably related to legitimate penological objectives); *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) (SHU inmate may be denied the right to attend congregate religious services if based upon legitimate penological concerns); *Matiyn v. Henderson*, 841 F.2d 31 (2d Cir.) (plaintiff’s First Amendment free exercise claim that he was prevented from attending congregate religious services is without merit because the denial was for reasons related to legitimate penological interests), *cert denied*, 487 U.S. 1220 (1988).  Accordingly, plaintiff has not established that his right to freely exercise his religion under the First Amendment Free Exercise Clause was violated because of his inability to attend congregate religious services while housed in Upstate SHU.

## 2.    RLUIPA

Under RLUIPA, the Court must determine whether the defendants’ policy of prohibiting attendance at congregate religious services by SHU inmates is a compelling state interest and

---

[16] *See Webster v. Fischer*, No. 9:08-CV-0071, 2010 WL 890968, at *7 n.11 (N.D.N.Y. Mar. 9, 2010) (explaining that SHU is different than keeplock because SHU is a more restrictive confinement than keeplock).

whether their policy is the least restrictive method for achieving those interests.

Based upon the record evidence the court finds that, even though defendants may be "substantially burdening" plaintiff's religion by not allowing him to attend Jumu'ah services while incarcerated in Upstate SHU, defendants' policy is the least restrictive means of furthering the compelling state interests, namely concern for prison security, as well as fiscal and staffing considerations that would dictate against allowing SHU inmates at Upstate to attend congregate religious services. *See Orafan*, 411 F. Supp. 2d at 160 (stating that "[f]iscal, staffing, and space considerations are part of maintaining security and preserving order") (citation omitted).  Issues of safety and security are "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 128 (1977) (quoting *Pell*, 417 U.S. at 827).  Defendants have provided substantial evidence to support their compelling state interest in prohibiting SHU inmates from congregate religious services and have also demonstrated that their policy is the least restrictive method for achieving those interests. *See supra*, Section V.D.1.

This Court finds that the enforcement of DOCS Directive 4933 § 304.9(d), serves a compelling governmental interest and is the least restrictive means of addressing the compelling governmental interest.  Accordingly, plaintiff has not established that his free exercise rights under RLUIPA were violated because of his inability to attend congregate religious services while housed in Upstate SHU.


## VI.  PERSONAL INVOLVEMENT

41

Defendants Fischer, Leonard, and Perlman contend that plaintiff has failed to establish their personal involvement.  Dkt. No. 87-4 at 34-35.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright*, 21 F.3d at 501).

It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement.  *Smart v. Goord*, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006).  The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation.  *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs*., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007).  Additionally, "[a] position in a hierarchical chain of command, absent something more, is insufficient to support a showing of personal involvement."  *Shepherd v. Goord,* No. 9:04-CV-655, 2008 WL 4283410, at *5 (N.D.N.Y. Sept. 16, 2008).

Plaintiff attempts to show that defendant DOCS Commissioner Brian Fischer, as a supervisory defendant, is personally responsible because he was made aware of the alleged problem but failed to remedy the situation.  There is no evidence in this case that defendant

Fischer was personally involved in the alleged constitutional deprivation of plaintiff's rights to freely exercise his religion.  Plaintiff sent a letter, dated June 15, 2007, to defendant Fischer complaining that he was not allowed to pray Salaah in the recreation yard at Clinton.  Dkt. No. 87-7 ("Fischer Decl.") (Ex. A).  Fischer's staff forwarded the letter to the Deputy Commissioner of Program Services John H. Nuttall.  Fischer Decl. ¶¶ 15-20; *see also id.* (Ex. A).  The letter was then addressed by Mr. Nuttall.  Fischer Decl. (Ex. B).  These allegations fail to demonstrate personal involvement by defendant Fischer in plaintiff's claims that he was denied the right to freely exercise his religion.  Plaintiff's remaining allegations against Fischer are that Fischer received letters of complaint from other inmates regarding similar issues raised by plaintiff in this action, but Fischer "only forwarded [those letters] to lower officials without any relief nor correction."  Supp.Compl. ¶ 37.  Plaintiff also seems to allege that Fischer is responsible for the policy which prohibits SHU inmates from attending congregate religious services.  Supp.Compl. ¶ 87.  These allegations are conclusory and unsupported by the evidence, and only suggest that Fischer is responsible for the policy because he is in a position of authority.  Additionally, at his deposition, when asked "You are suing [Fischer] as an administrator of the policy?"[17] plaintiff responded "Yes. That he didn't take any actions to correct it."  Trans. at 66.  Plaintiff has failed to demonstrate personal involvement by defendant Fischer in plaintiff's claims that he was denied the right to freely exercise his religion.

Defendant Mark Leonard is the Director of Ministerial, Family, and Volunteer Services for DOCS.  Dkt. No. 87-9 ("Leonard Decl.") ¶ 5.  Plaintiff alleges that in that capacity, defendant Leonard "was responsible for and oversaw the management, operations and policies affecting

---

[17]  Plaintiff wrote to Fischer regarding his inability to pray Salaah demonstratively in the recreation yard at Clinton, yet at his deposition, he appeared to claim that defendant Fischer is responsible for all DOCS policies that implicate plaintiff's claims regarding both his right to pray and his right as a SHU inmate to attend congregate religious services.  Trans. at 66.

religious programs" for DOCS.  Supp.Compl. ¶ 39.  Plaintiff sent a letter, dated December 24, 2007, to defendant Leonard "discussing the issue of accommodation to attend weekly congregate religious services (Jumu'ah)."  *Id.* ¶ 50; *see also id.* (Ex. E).  Leonard's staff forwarded the letter to the Assistant Director of Ministerial, Family, and Volunteer Services, Omega B. Alston.  Leonard Decl. ¶¶ 6-11.  The letter was then addressed by Mr. Alston, who advised plaintiff that he in turn was referring the letter to Imam Abdulkhabir, Ministerial Program Coordinator for the Muslim faith.  Leonard Decl. (Ex. B).  Plaintiff also alleges that Leonard is responsible for the policy which prohibits SHU inmates from attending congregate religious services.  Supp.Compl. ¶ 87.  These allegations are conclusory and unsupported by the evidence, and only suggest that Leonard is responsible for the policy because he is in a position of authority.  Plaintiff has failed to demonstrate personal involvement by defendant Leonard in plaintiff's claims that he denied the right to freely exercise his religion.

Defendant Kenneth Perlman is the Deputy Commissioner of Program Services for DOCS. Dkt. No. 87-10 ("Perlman Decl.") ¶ 3.  Plaintiff alleges that, pursuant to DOCS Directives 4200 and 4202, defendant Perlman "is responsible for the operations, directives and policies affecting religious programs."  Supp.Compl. ¶ 38.  Plaintiff also alleges that defendant Perlman is responsible for the policy which prohibits SHU inmates from attending congregate religious services.  Supp.Compl. ¶ 87.  The fact that Perlman signed DOCS Directive 4933 (*see* Dkt. No. 87-2 at 141) could lead a reasonable juror to conclude that Perlman was personally involved in the promulgation of the DOCS policy which prohibits SHU inmates from attending congregate religious services.  Moreover, at his deposition, plaintiff testified that "I wrote to [Perlman] directly and received correspondence from him too showing there is no correction on his part for the policies or for prohibitions."  Trans. at 68.  The Court cannot find as a matter or law that

defendant Perlman was not personally involved in the violation of plaintiff's rights.

Accordingly, defendants' request for summary judgment on the basis of lack of personal involvement is **granted** at to Fischer and Leonard, and **denied** as to Perlman.

## VII.  QUALIFIED IMMUNITY

The doctrine of qualified immunity shields officials from liability from civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, --- U.S. ----, ----, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In *Pearson*, the Supreme Court overruled its decision in *Saucier v. Katz*, 533 U.S. 194 (2001), to the extent that the Court in *Saucier* required a specific two-step sequence for deciding qualified immunity claims.  *Pearson*, 129 S.Ct. at 815-22.

Under *Saucier*, when confronted with defendants' claim of qualified immunity, the court was mandated to use a two-step procedure. 533 U.S. at 201. The first step required the court to determine whether plaintiff's facts established the violation of a constitutional right.  *Id*.  If so, the court would then decide whether the right at issue was "clearly established" at the time of the defendants' alleged conduct. *Id*.  Decisions prior to *Saucier* had "suggested" that the better approach was to determine whether a constitutional right was violated at all, but *Saucier* turned that suggestion into a requirement.  *Pearson*, 129 S.Ct. at 816 (citing *Saucier*, 533 U.S. at 201; *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (stating that resolution of the constitutional issue first was the "better approach").

In *Pearson*, the Supreme Court rejected what it referred to as *Saucier*'s "'rigid order of battle,'" in favor of allowing the courts to exercise their sound discretion in determining which of

45

the two prongs of the qualified immunity analysis should be addressed first. *See Pearson*, 129 S.Ct. at 817-818 (citing *Purtell v. Mason*, 527 F.3d 615, 622 (7th Cir. 2008) (referring to the *Saucier* standard as a "rigid order of battle")). The court in *Pearson* stated that the unnecessary litigation of constitutional issues is to be avoided, and there are cases in which it is "plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson*, 129 S. St. at 818.

## A.      Prayer in the recreation yard

When analyzing qualified immunity, "[f]or a right to be clearly established it 'must have been recognized in a particularized rather than a general sense.'" *Farid v. Ellen*, 593 F.3d 233 (2d Cir. 2010) (citing and quoting *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007)). The analysis must therefore focus on the right in question "at the appropriate level of specificity." *Id.* (citing and quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). When measured against these principles, the specific question here presented is whether it was objectively reasonable for defendants to believe that plaintiff did not have a clearly established constitutional right to conduct his Salaah prayer in a demonstrative manner in the recreation yard. Although it is well-established that prisoners have a right to practice their religion while incarcerated, the Second Circuit has not yet definitively determined the boundaries of reasonableness with respect to restrictions on prayer in the prison yards.

In *Shabazz v. Coughlin*, 852 F.2d 697, 700-02 (2d Cir. 1988), the Second Circuit held that while an inmate's right to attend religious services in general was clearly established, the right to group prayer and prayer in the yard was not well-established for purposes of qualified immunity.

In *Chatin v. Coombe*, 186 F.3d 82 (2d Cir. 1999), the court held that Disciplinary Rule 105.11, prohibiting the conduct of "religious services" could not be used to discipline an

individual for silent demonstrative prayer in the prison yard.  However, the court simply found that the rule was unconstitutionally vague for due process purposes.  *Id*.  Because the district court decided the case on the due process claim, the court did not reach the plaintiff's First Amendment claim.  *See Chatin v. New York*, No. 96 Civ. 420, 1998 WL 196195, at *6-8 (S.D.N.Y. Apr. 23, 1998).  The court in *Chatin* specifically stated, however, that it was not deciding the issue of whether such conduct could be prevented by using a rule that gave inmates the required notice of what was prohibited.  *Id*. at 89-90.  The *Chatin* court also stated that it was not suggesting that prison officials were prevented from preventing such conduct by utilizing already existing rules that prevented disturbances or interference with others when the circumstances warranted it.  *Id*. Thus, nothing in the *Chatin* decision established that an inmate has the right to pray in the recreation yard as plaintiff was attempting to do.

In *McEachin v. McGuinnis*, 357 F.3d 197 (2d Cir. 2004), the plaintiff had been disciplined for failure to obey a corrections officer's order to return his tray and cup, an order plaintiff claims was "expressly given to him by a corrections officer who knew that completion of the task would require plaintiff to abandon religious prayers in which he was then engaged."  *Id*. at 204-05.  As a result of the disciplinary hearing, plaintiff was subjected to a week-long restricted diet, resulting in his inability to break his Ramadan fast with the appropriate food.  *Id*. at 199.  District Court *sua sponte* dismissed the complaint; the Second Circuit reversed, stating:

> When McEachin's complaint is liberally construed, two First Amendment concerns arise. First, McEachin asserts that the seven-day restrictive diet imposed upon him as discipline by the defendants impinged upon his observance of Ramadan by depriving him of properly blessed food with which to break his daily fast. In addition, McEachin alleges that this discipline was itself a product of religious discrimination by a corrections officer who intentionally ordered McEachin to return his tray and cup during McEachin's prayer, knowing that the plaintiff's beliefs would not permit him to respond to the command before he had finished making salat. If these allegations are true, an unconstitutional burden may have been placed on McEachin's free exercise rights.

*Id*. at 201 (footnote omitted). The *McEachin* court thus emphasized the allegation that the corrections officer intentionally ordered plaintiff to perform the task, knowing that obeying the order would require plaintiff to violate his religious beliefs. *Id*. at 204. The court observed that "[p]recedent suggests that inmates have a right not to be disciplined for refusing to perform tasks that violate their religious beliefs." *Id*. at 205 (citing *Hayes v. Long*, 72 F.3d 70 (8th Cir. 1995) (inmate disciplined for refusing to handle pork while performing kitchen duties)). The court in *McEachin* ultimately did not rule on this issue because it remanded the case to the district court for consideration of the First Amendment claims. *McEachin* does not clearly establish the right asserted by plaintiff in the case at bar.

In *Withrow v. Bartlett*, 15 F. Supp. 2d 292 (W.D.N.Y. 1998), the court granted summary judgment in a case in which plaintiff was disciplined for engaging in group demonstrative prayer in the prison yard and violating an officer's order to stop. *Withrow* and the case at bar may be distinguished from *McEachin* on the ground that in this case and *Withrow* the prohibited activity is the method of prayer, that is, a demonstrative prayer in an area of the prison where it was not authorized by the existing rules. In *Withrow*, the officers issuing the orders believed that the plaintiffs' religious conduct was not permitted, a belief that was supported by the DOCS Directive.

In this case, plaintiff relies heavily on *Aziz v. LeFevre*, 642 F.2d 1109 (2d Cir. 1981) in support of his suggested accommodation that inmates at Clinton be allowed to pray Salaah demonstratively in groups of no more than six on the sectioned recreation courts. Dkt. No. 93 at 32. In *Aziz*, inmates brought action challenging Clinton's policy, based upon DOCS Directive 4203(A)(3)(a),[18] which prohibited small groups of inmates from praying their Salaah in the prison

---

[18] Then DOCS Directive 4203(A)(3)(a) provided that "[i]nmates will be allowed to pray only in the privacy of their own living quarters, during a religious service or in an area of the facility that has been designated for religious worship." *Aziz*, 642 F.2d at 1110. This directive differs from DOCS Directive 4202 in that, notably absent from 4203 is the language giving the superintendent of each facility to determine where, at his or her facility, inmates

recreation yard.  *Aziz*, 642 F.2d at 1110.  The Second Circuit in *Aziz* did not rule on any of the

issues presented, but instead remanded the case to the district court for consideration of the First

Amendment claims.[19]  *Aziz*, 642 F.2d at 1112.  In doing so, the *Aziz* Court stated that it "was

reluctant to decide the constitutional question prematurely and unnecessarily, and indeed we have

well in mind the Supreme Court's recent admonitions to us not to do so."  *Id*. at 1112.  The *Aziz*

Court further stated, "we decline to reach the difficult constitutional question presented." *Id*.  On

remand, the District Court never reached the question presented in *Aziz*.  After the remand, the

case was ultimately dismissed, without resolution, in the District Court for failure of the parties to

prosecute the action.  *See* Dkt. No. 91-1 at 5, Order referenced at docket entry 70.[20]  Contrary to

plaintiff's assertions, *Aziz* does not clearly establish the right asserted by plaintiff in the case at bar.

There has also been disagreement among New York State courts as to whether prohibiting

demonstrative prayer in the recreation yard is a violation of religious rights.  *Compare Jackson v.

Coughlin*, 204 A.D.2d 939 (3rd Dep't 1994) (finding that facility policy that prohibits Muslim

inmates from praying demonstratively in the recreation yard does not violate plaintiff's right to

religious freedom under the New York Constitution or Correction Law § 610) *with Matter of

Abudullah*, 115 Misc. 2d 105, 108 (Sup.Ct. Wyo.Co. 1982) (finding that the justification that

demonstrative prayer would be disruptive was insufficient reason to curtail an inmate's right to

---

will be allowed to conduct demonstrative prayer, whether individually or as a group.  The Second Circuit in *Aziz*
seemed concerned that the ban on prayer in the recreation yard was not being followed uniformly at every DOCS'
facility and "hence [making it] not a 'policy' at all."  *Aziz*, 642 F.2d at 1111.  This concern would not be relevant to
DOCS Directive 4202 as the Directive makes clear that the actual "policy" is put in place by each superintendent.

[19]  *Aziz* merely noted that "individual, silent prayer [was] permitted in the segmented areas of the prison yard
known as 'courts.'" *Aziz*, 642 F.2d at 1112.

[20]  The Court previously provided plaintiff with a copy of the docket report for the *Aziz* action.  See Dkt. No.
91-1 at 2-5.  Since that time, the Court was able to obtain from the Federal Records Center a copy of the Order
referenced therein at docket number 70.  That Order closed the action without disposition for the parties' failure to
prosecute.

freely exercise his religion, but noting the "narrowness of this ruling"),[21] *aff'd* 96 A.D.2d 742 (4th Dep't 1983).

Thus, it still does not appear well established that an inmate has the right to pray demonstratively in the recreation yard.  This court is not aware of any case at or before the time relevant to this action that would "clearly establish" that plaintiff had a right to pray in a demonstrative manner either alone, or together with six other inmates in a sectioned-off area of the recreation yard.

Additionally, DOCS Directive 4202, as implemented by each superintendent at Clinton and Great Meadow, supported defendants' actions; defendants could not reasonably have believed that their action in denying plaintiff the right to pray demonstratively, either individually or in a small group during the recreation period was in violation of plaintiff's constitutional rights.  Thus, based on the facts in this case, any claim for damages would be barred by the doctrine of qualified immunity even if ultimately plaintiff's First Amendment rights had been infringed.

The qualified immunity would apply to plaintiff's RLUIPA claim. *See Orafan v. Goord*, 411 F. Supp. 2d 153, 158 (N.D.N.Y. 2006), vacated and remanded on other grounds sub nom. *Orafan v. Rashid*, 249 Fed. Appx. 217 (2d Cir. 2007).  In any event, it has been held that a RLUIPA plaintiff may not obtain monetary damages under the statute either from defendants in their individual or official capacities. *Pugh v. Goord*, 571 F. Supp. 2d 477, 506-09.[22]  Thus, plaintiff in this case would not be able to obtain money damages from defendants.

---

[21]  The court noted that there might be merit to some of defendants' other concerns.  *Id.*

[22]  The Fifth Circuit has recently held that RLUIPA affords inmates the ability to obtain declaratory and injunctive relief against a "government," but does not provide for damages against either a defendant in his individual capacity or the state, including defendants in their "official capacities." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326-331 (5th Cir. 2009) (discussing cases, including those circuits that have allowed such actions, however, noting that where such a claim is allowed individually, the qualified immunity analysis would apply) (*cert. granted in part*, 130 S.Ct. 3319).

Qualified immunity would not, however, bar any claim for equitable relief.  *See Pearson*, 129 S.Ct. at 822 (no qualified immunity in cases in which injunctive relief is sought instead of or in addition to damages); *Salahuddin*, 467 F.3d at 273 (qualified immunity is an affirmative defense to monetary liability).  Plaintiff's only request for equitable relief is contained in his amended complaint against Clinton Superintendent Artus and Clinton Deputy Superintendent Turner.  Am.Compl. at 10; *compare* Supp.Compl. at 14 (plaintiff requests only compensatory, punitive and monetary damages in the supplemental complaint).  Plaintiff requests that defendants Artus and Turner "cease enforcing the policy" at Clinton that prohibits anything but silent, non-demonstrative prayer in the recreation yard at Clinton.  However, plaintiff is no longer incarcerated at Clinton. An inmate's transfer from a facility generally renders moot any claims for declaratory and injunctive relief against officials of that facility. *Salahuddin*, 467 F.2d at 272 (citing *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ( per curiam); *Young v. Coughlin*, 886 F.2d 567, 568 n. 1 (2d Cir. 1989); *Mawhinney v. Henderson*, 542 F.2d 1, 2 (2d Cir. 1976)).  Because plaintiff is no longer incarcerated at Clinton, his claims against Artus and Turner for declaratory and injunctive relief are dismissed as moot.  In any event, even if the Court were to construe plaintiff's supplemental complaint as seeking equitable relief, plaintiff is no longer at either Clinton or Great Meadow, therefore his claims that he was denied the ability to pray demonstratively during recreation at those facilities are also moot for purposes of any injunctive or declaratory relief.

## B.      Congregate Services for SHU inmates

Inasmuch as this Court finds that plaintiff has failed to prove any constitutional violation with respect to his inability to attend congregate religious services while housed in Upstate SHU, defendants are entitled to summary judgment on this ground.  *Dorcely v. Wyandanch Union Free*

*Sch. Dist.*, 665 F. Supp. 2d 178, 219 (E.D.N.Y. 2009) (quoting *Cathedral Church of the Intercessor v. Inc. Vill. of Malverne*, 353 F. Supp. 2d 375, 391 (E.D.N.Y. 2005)) ("Without an underlying constitutional violation, qualified immunity cannot attach.").

## VIII.  MOTIONS FOR INJUNCTIVE RELIEF

Plaintiff filed a first motion for injunctive relief, asking for a temporary restraining order and preliminary injunction "enjoining defendants from enforcing their blanketed ban from religious services against SHU-prisoners upon plaintiff and directing defendants to permit plaintiff to attend his designated congregate religious services" of Jumu'ah on Friday afternoons plus additional services held during Ramadan.  Dkt. No. 105.  At the time plaintiff filed this motion, he was incarcerated in SHU at Coxsackie Correctional Facility ("Coxsackie").  *Id*.  Defendants opposed the motion as it was not related to the claims in the underlying action, which claims occurred while plaintiff was incarcerated at Upstate, Clinton, and Great Meadow.  Dkt. No. 106.  Defendants also argued that, in any event, plaintiff's underlying claims were without merit.  *Id*.  Plaintiff has recently requested that the Court "strike" his first motion (Dkt. No. 105) for injunctive relief and, in light of changed circumstances (which include his transfer to Upstate SHU) replace it with his recently-filed second motion (Dkt. No. 109) for a temporary restraining order and preliminary injunction.  Dkt. No. 109 at 2-3.  In light of plaintiff's request to withdraw his first motion, plaintiff's first motion for a temporary restraining order and preliminary injunction (Dkt. No. 105) is **DENIED as moot**.

Turning to plaintiff's second motion for a temporary restraining order and preliminary injunctive relief, plaintiff advises that he has now been transferred to Upstate SHU and is again being denied the ability to attend congregate religious services.  Dkt. No. 109.  Plaintiff requests a

court order directing defendants "to permit and accommodate plaintiff's attendance" at congregate

religious services while he is incarcerated in SHU at Upstate.  Dkt. No. 109-1 at 5.

A preliminary injunction is an "extraordinary remedy that should not be granted as a

routine matter." *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986).  In most cases, to warrant the

issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a

likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the

merits, and a balance of hardships tipping decidedly in favor of the moving party.  *D.D. ex rel.*

*V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006) (quotation omitted). "The

purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable

harm until the court has an opportunity to rule on the ... merits.'" *Candelaria v. Baker*, No. 00-CV-

0912E, 2006 WL 618576, at *3 (W.D.N.Y. Mar. 10, 2006) (quoting *Devose v. Herrington,* 42 F.3d

470, 471 (8th Cir.1994) (per curiam)).  The same standards govern consideration of an application

for a temporary restraining order. *Perri v. Bloomberg*, No. 06-CV-403, 2008 WL 2944642, at * 2

(E.D.N.Y. Jul. 31, 2008) (citing *Therrien v. Martin,* No. 3:07-cv-1285 (JCH), 2007 WL 3102181,

at *5 (D.Conn. Oct. 19, 2007)).

The Court has already determined that DOCS Directive 4933 is constitutional in its

requirement that a SHU inmate may not attend congregate religious services as it has a valid,

rational connection to the legitimate penological interest of security, staffing, and the preservation

of scarce fiscal resources (or in the case of RLUIPA, a compelling state interest of maintaining

security, including adequate staffing levels and fiscal resources).  Therefore, the second request for

a temporary restraining order and preliminary injunction (Dkt. No. 109) is **denied**.


### IX.  CONCLUSION

Based on a thorough review of a very extensive record, this court finds as follows.

Genuine issues of material fact remain as to whether (1) DOCS Directive 4202, *as specifically implemented* at Clinton and Great Meadow is rationally related to a valid penological interest, or in the case of RLUIPA, a compelling governmental interest, or (2) the alternatives offered by the defendants are the least restrictive alternatives available that would serve those interests.  However, because the right to pray demonstratively in the prison recreation yard was not clearly established at the time of the events alleged herein, defendants are nonetheless entitled to qualified immunity in this regard with respect to monetary damages.  Moreover, plaintiff's requests for injunctive and declaratory relief are moot.

DOCS Directive 4933 is constitutional in its requirement that a SHU inmate may not attend congregate religious services as it has a valid, rational connection to the legitimate penological interest of security, staffing, and the preservation of scarce fiscal resources.  The Directive also does not violate RLUIPA because there is a compelling governmental interest in maintaining the security, fiscal soundness, and staffing levels of the correctional facility.  Also, DOCS Directive 4933 is the least restrictive means of furthering those interests.

Accordingly, defendants' motion for summary judgment (Dkt. No. 87) is **GRANTED** in all respects and plaintiff's motion for partial summary judgment (Dkt. No. 91) is **DENIED**.  Additionally, for the reasons set forth above, plaintiff's motions (Dkt. Nos. 105, 109) for a temporary restraining order and a preliminary injunction are **DENIED**.

 **Accordingly, it is hereby**

**ORDERED** that all claims brought pursuant to (1) the First Amendment Establishment Clause; (2) the Equal Protection Clause; (3) RFRA; and (4) state law are dismissed **with prejudice**; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 87) is **GRANTED** in its entirety and all claims and defendants in both the amended complaint and the supplemental complaint are **dismissed with prejudice**; and it is further

**ORDERED** that plaintiff's motion for partial summary judgment (Dkt. No. 93) is **DENIED**; and it is further

**ORDERED** that plaintiff's motions (Dkt. Nos. 105 and 109) for a temporary restraining order and a preliminary injunction are **DENIED** for the reasons set forth above; and it is further

**ORDERED** that the Clerk is directed to serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules; and it is further

**ORDERED** that pursuant to Local Rule 72.3, the parties are advised that the referral to a Magistrate Judge has been **RESCINDED**, as such, any appeal taken from this Memorandum-Decision and Order will be to the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED.**

Date: September 30, 2010

Norman A. Mordue
Chief United States District Court Judge